Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MICHELLE SCHENCK,**<br>Plaintiff,<br><br>v.<br><br>**UNITED AIRLINES, INC.,**<br>Defendant. | Civil Action No.: 23-3816 (ES) (SDA)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

This comes before the Court on Defendant United Airlines, Inc.'s ("Defendant") Motion to Dismiss Plaintiff Michelle Schenck's ("Plaintiff") Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.E. No. 114). Having carefully considered the parties' submissions and other relevant portions of the record, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons discussed herein, Defendant's motion is **GRANTED IN-PART AND DENIED IN-PART**.

**I.   RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff, who "worked as a flight attendant for Defendant from March 1998 through January 27, 2020", (D.E. No. 51 ¶ 13 ("Second Amended Complaint" or "SAC")), alleges that Defendant violated both Title VII of the Civil Rights Act of 1964, as amended, 42 USC §§ 2000e, et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 USC §§ 621, et seq. ("ADEA"). (*See generally* SAC). Her factual allegations cover two different situations: (i) Plaintiff's alleged ongoing exclusion from lucrative chartered flights on the basis of her age; and (ii) Plaintiff's experiences on a particular international flight in December 2019, and her later

termination in connection with those events. The Court will discuss Plaintiff's allegations for both sets of events in turn.

### A. Plaintiff's Exclusion from Chartered Flights

Beginning in 2015, Plaintiff "became aware that, notwithstanding her seniority rights under the collective bargaining agreement, she was not selected for Sport Charter trips that had been assigned to younger, more junior flight attendants." (*Id.* ¶ 25). Plaintiff further alleges that she lost wages as a result of being denied the opportunity to work on those lucrative chartered flights. (*Id.* ¶ 26). In July 2015, Plaintiff complained to her supervisor "that she was being subjected to disparate treatment on the basis of her age" and asked "how she could be assigned to the 'designated crew" list for Sport Charter trips." (*Id.* ¶ 27). Defendant's management did not address Plaintiff's concerns and Plaintiff "feared that she had been 'red-flagged' . . . because she had raised the question of disparate treatment." (*Id.* ¶ 29).

"Between 2015 and 2019, Defendant continu[ed to] assign less-experienced, younger co-workers with less seniority than Plaintiff to charter and commercial trips." (*Id.* ¶ 30). Plaintiff again raised the issue with Defendant's personnel in connection with a specific chartered flight in August of 2019. (*Id.* ¶ 33). In response, Defendant's Sports Charter Coordinator, whom Plaintiff alleges was responsible for selecting all flight attendants for charter flights for professional sports teams, (*id.* ¶ 38), advised that Plaintiff would never be selected to work on a particular team's flights, and otherwise refused to provide information on how Plaintiff could be assigned to other chartered trips. (*Id.* ¶ 34). Plaintiff alleges that, shortly after that interaction, "Defendant blocked [her] access to 'CCS' the Flight Attendant App that allowed employees to trade and pick-up trips." (*Id.* ¶ 36).

### B. The December 2019 Trip and Plaintiff's Subsequent Termination

Plaintiff alleges that "[o]n December 16, 2019, [she] was part of an eight-member flight attendant crew for a three-day trip between Newark International Airport and Heathrow International Airport. London, England." (*Id.* ¶ 45). Plaintiff alleges that she was the sole Caucasian member of that crew, (*id.* ¶¶ 46–48), and that she "was ostracized and isolated by the other women in the flight crew during the flight to London." (*Id.* ¶ 53).

"When the crew arrived in London, Blandin Clark, [a] male African American flight attendant[,] asked Plaintiff if he could join her for dinner and shopping," (*id.* ¶ 54), and Plaintiff agreed. (*Id.* ¶ 55). Shortly before the return flight, Plaintiff commented to other flight attendants that she had a "great time" with Mr. Clark the prior day, (*id.* ¶ 60), and "stated words to the effect of 'I had such a nice time with Blandin yesterday- that boy even helped me hold my bags while I put my coat on. What a gentleman[.]'" (*Id.* ¶ 61). After the crew boarded the aircraft, the Lead Attendant on the flight confronted Plaintiff about her word choice ("calling a Black man a 'Boy'") and Plaintiff apologized, stating that she was unaware it might be offensive. (*Id.* ¶ 63–64). During the flight, certain of the other flight attendants "repeatedly chanted 'Black Lives Matter'" and "addressed Plaintiff as B***h and 'Karen'" when in Plaintiff's earshot. (*Id.* ¶ 68–69).

After the trip, the Lead Attendant filed a complaint regarding Plaintiff's behavior. (*Id.* ¶ 71). Plaintiff alleges that "[t]he six women crew members colluded to provide false and exaggerated statements describing allegedly racially insensitive comments by Plaintiff," (*id.* ¶ 75), and that they also "pressured Mr. Clark to submit an inaccurate description of Plaintiff's comments that corroborated the false statements [they had prepared]." (*Id.* ¶ 76). Defendant investigated the Lead Attendant's complaint. (*Id.* ¶ 77). Plaintiff alleges that Defendant's representatives "disregarded" her statements regarding the "racially based harassment she endured from the

members of the flight attendant crew" during the December 2019 trip. (*Id.* ¶ 86). Defendant ultimately terminated Plaintiff's employment on January 27, 2020, for alleged violation of its "Working Together expectations" and "Promoting Dignity and Respect: Harassment and Discrimination Do not Fly Here" policies. (*Id.* ¶ 88). Plaintiff appealed that decision, but Defendant ultimately upheld her termination. (*Id.* ¶¶ 91–92). Plaintiff alleges that "Defendant's stated reason for discharging [her] was a pretext, and Plaintiff was instead discharged because of her race and or age." (*Id.* ¶ 95).

### C. Plaintiff Files a Charge with the Equal Employment Opportunity Commission and then Initiates this Lawsuit

On May 12, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 6; D.E. No. 1 at 16 of 21 ("Charge")). In that Charge, Plaintiff checked boxes denoting discrimination based on both "RACE" and "AGE". (*See generally* Charge). Plaintiff did not check the box indicating "RETALIATION." (*Id.*). Plaintiff indicated that both the "earliest" and "latest" dates of discrimination were "1-27-2020," the date Defendant terminated her employment. (*Id.*). Providing a narrative of the "particulars" of her Charge, Plaintiff wrote:

> I began working for the above named Respondent on/about Mach [sic] 2, 1998. I was last classified as International/Domestic Flight Attendant.
>
> I worked a 3 day trip from Newark to London on December 16, 2019 - December 18, 2019. During the layover, myself along with flight attendant Blandin Clark, went shopping and went to dinner. The next day, myself, Blandin Clark, 6 other flight attendants, one pass rider were on the elevator on our way to the flight, when I stated that Blandin had been the perfect gentleman on our layover the day before and that he had even held my bags while I put my coat on. I actually made the comment 'that boy was such a gentleman' That same day, while preparing for the flight, I was called to the back of the plane by Crystal Baxter, Lead Attendant. Crystal Informed me that where she was from it was considered offensive to refer to a black male as a boy. I Informed Crystal that I wasn't trying to be

4

> offensive and that I would apologize to Blandin. Crystal told me that it wasn't necessary because Blandin did not know that she was speaking to me about it.
>
> On/about January 8, 2020 I received a phone call from Newark, Supervisor, Gloria Reid. Ms. Reid informed me that there had been an incident on the plane and there was going to be an investigation conducted. There was originally a meeting scheduled for 1/13/2020 but it was changed to 1/15/2020. When I asked Ms. Reid what the purpose of the meeting was, she told me that she didn't know. I learned at the meeting that Crystal Baxter had filed a complaint with United Management Ethics and Compliance on December 23, 2019. The complaint stated that I said 'I made that black boy carry my shit'. This is not true. I also learned that all the flight attendants who were working that flight filed a complaint against me. Of the 8 attendants (crew members), I was the only one who was white. I was terminated on January 27, 2020. Respondent's stated reason for my termination was inappropriate behavior.
>
> I believe I was discriminated against and unfairly terminated because of my age (date of birth 7/5/1955) as I am older than most of the other flight attendants and also because of my race/White, as the flight attendants who filed false claims against me are 6 African American and 1 Asian. This is in willful violation of The Age Discrimination in Employment Act as well as Title VII of the Civil Rights Act of 1964 as amended.

(Charge at 1-2) (copied verbatim).

On February 26, 2021, the EEOC issued a letter advising that it had concluded processing Plaintiff's Charge and had issued a "Notice of Dismissal and Right to Sue" (attached thereto) (SAC ¶ 7; D.E. No. 1 at 13 of 21) ("Right to Sue Letter"). The Right to Sue Letter advised, in pertinent part: "Following this dismissal, you may only pursue this matter by filing suit against the Respondent named in the charge within 90 days . . . Otherwise, your right to sue will be lost." (Right to Sue Letter at 1).

Though she later retained counsel, Plaintiff originally commenced this case as a pro se litigant by filing a Complaint in the United States District Court for the Western District of New York on May 21, 2021. (D.E. No. 1). While the intervening procedural history has been

significant, most of it is irrelevant to Defendant's Motion to Dismiss. As the parties are undoubtedly familiar with the history of the case, the Court will focus solely on the developments salient to Defendant's application, beginning with Plaintiff's operative pleading, the Second Amended Complaint, which she filed on May 22, 2023. (*See generally* SAC). In that pleading, Plaintiff made the factual allegations described above and asserted causes of action for age discrimination (both disparate treatment and unlawful termination), racial discrimination (both hostile work environment and wrongful termination), and unlawful retaliation. (SAC ¶¶ 96-111). By Order dated July 17, 2023, the Hon. Lawrence J. Vilardo, U.S.D.J., granted Plaintiff's unopposed motion to transfer the case to the District of New Jersey, (D.E. No. 56), where it was assigned to the Undersigned. On January 29, 2024, Defendant filed a motion to dismiss the Second Amended Complaint, (D.E. No. 102), which the parties have since fully briefed. (D.E. Nos. 103 & 104). By Order dated May 16, 2024, the Undersigned administratively terminated Defendant's motion and directed the parties to submit supplemental briefing "on the issue of proper service, explaining why the Court should not dismiss this case under Federal Rule of Procedure 4(m) and analyzing the relevant factors . . ." (D.E. No. 107). The parties filed their supplemental submissions, (D.E. Nos. 112 & 113), and Defendant thereafter refiled its Motion to Dismiss. (D.E. No. 114). Rather than file new supporting documents, the parties have elected to rely on their previously submitted briefing.

## II.     DISCUSSION

In its Motion, Defendant argues that the Court should dismiss Plaintiff's claims both for: (i) insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5); and (ii) failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See generally* D.E. No. 102-1 ("Moving Br.")). The Court will consider these arguments in turn.

        **A.**       **Motion to Dismiss for Insufficient Service of Process**

Defendant argues that the Court should dismiss Plaintiff's claims given her undisputed failure to effectuate timely service in accordance with Federal Rule of Civil Procedure 4(m). (*Id.* at 30-34). Defendant further argues that, in light of Plaintiff's untimely service, the relevant limitations period—tolled when Plaintiff filed her Complaint—began to run again and then expired, forever barring Plaintiff's claims thereafter. (*Id.* at 33–34). In response, Plaintiff argues: (i) good cause exists for the Court to retroactively extend Plaintiff's deadline to effectuate service; and (ii) even if the Court finds that good cause is lacking, the Court should use its discretionary authority to extend the time for service. (D.E. No. 103 ("Opp. Br.") at 19-20 & D.E. No. 112 ("Pl. Supp. Br.") at 1-3).

Neither the relevant law nor the salient facts are in dispute. Here, Plaintiff commenced this action on May 21, 2021, (D.E. No. 1), which triggered her obligation to effectuate service within 90 days in accordance with Federal Rule of Civil Procedure 4(m). On the same day, Plaintiff filed an application to proceed *in forma pauperis*, (D.E. No. 2), which the United States District Court for the Western District of New York denied by Order dated July 9, 2021. (D.E. No. 5). Defendant acknowledges that Plaintiff's deadline to effectuate service was tolled during the 49 days her application to proceed *in forma pauperis* remained pending, (D.E. No. 113 ("Def. Supp. Br.") at 8), such that Rule 4(m) required her to complete service on or before October 7, 2021. (*Id.*). Nothing in the record suggests that Plaintiff ever served the original Complaint on Defendant— before October 7, 2021, or otherwise. Instead, the record reflects that Plaintiff filed her Amended Complaint on September 21, 2021, (D.E. No. 10), and thereafter served a summons and her amended pleading on Defendant on November 8, 2021, (D.E. No. 11), approximately 32 days after the October 7th deadline.

While Plaintiff failed to effectuate timely service, the Court must nevertheless extend the service period if she establishes "good cause" for that failure. Fed. R. Civ. P. 4(m); *Veal v. United States*, 84 F. App'x 253, 255 (3d Cir. 2004) ("The Third Circuit has construed Rule 4(m) as requiring a court to extend time for service where the plaintiff demonstrates good cause."). "Such a showing requires a demonstration of good faith on the part of the party seeking enlargement and some reasonable basis for noncompliance within the time specified by the rule." *Veal* 84 F. App'x at 255-56 (citing *MCI Telecom. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir.1995)). The United States Court of Appeals for the Third Circuit further clarified that an "absence of prejudice alone can never constitute good cause to excuse late service." *Id.* Rather, "while the prejudice may tip the 'good cause' scale, the primary focus is on the plaintiff's reasons for not complying with the time limit in the first place." *Id.*

Here, Plaintiff has not described her efforts to effectuate timely service, let alone explained why she was unable to do so. Plaintiff instead focuses on her prior *pro se* status, (Pl. Supp. Br. at 1–2), and argues that she "made diligent efforts to litigate this matter." (*Id.* at 2). Put simply, there is no basis in the record for the Court to find that Plaintiff pursued service in good faith or that there might be some "reasonable basis" for her failure to effectuate service in a timely manner. Plaintiff has therefore failed to establish the "good cause" required for an extension of time for service pursuant to Federal Rule of Civil Procedure 4(m).

Even where a plaintiff fails to demonstrate good cause for an extension, however, the Court may nevertheless "'in its discretion decide whether to dismiss the case without prejudice or extend time for service.'" *First Response v. New Jersey*, No. 21-1458, 2023 WL 3043633, at *2 (D.N.J. Apr. 21, 2023) (quoting *Petrucelli v. Bohringer & Ratzinger, GMBH*, 46 F.3d 1298, 1305 (3d Cir. 1995)). "In making its determination, 'the court may consider and balance several factors, such as

(1) actual notice of the action, (2) prejudice to the defendant, (3) statute of limitations, (4) conduct of the defendant, (5) whether the plaintiff is represented by counsel, and (6) any other relevant factor.'" *Id.* at *4 (quoting *Jumpp v. Jerkins*, No. 08-6268, 2010 WL 715678, at *7 (D.N.J. Mar. 1, 2010)).

As to the first factor, nothing in the record suggests that Defendant had actual notice of Plaintiff's lawsuit. On the other hand, the record does not reflect that Plaintiff's delay in effectuating service prejudiced Defendant in any way. While Defendant notes that "over **four and a half years** have lapsed since the termination of Plaintiff's employment and the occurrence of the events which underly [her] claims", (Def. Supp. Br. at 5) (emphasis in original), and that evidence may be lost as a result, Plaintiff delay in effectuating service was a mere 32 days. The Court does not find that Plaintiff's 32-day delay caused Defendant any legitimate prejudice. Third, while they disagree about the appropriate legal consequences, the parties appear to agree that Plaintiff's claims would be time-barred if the Court declines to exercise its discretion to extend the deadline for service. (*Compare* Pl. Supp. Br. at 3, *with* Def. Supp. Br. at 6). Fourth, nothing in the record suggests that Defendant evaded or otherwise impeded Plaintiff's efforts to effectuate service. Fifth, the Court notes that, while she now has counsel, Plaintiff was a *pro se* litigant during the relevant period. In sum, given Plaintiff's prior *pro se* status, the relatively short nature of her delay, the fact that the delay did not cause Defendant any discernable prejudice, and the fact that Plaintiff's claims would otherwise time-barred, the Court will exercise its discretion to extend her time to effectuate service, *nunc pro tunc*, through and including November 8, 2021. To the extent Defendant seeks dismissal based on Plaintiff's failure to effectuate timely service, that portion of its motion is therefore **DENIED**.

### B. Motion to Dismiss for Failure to State a Claim

Turning to Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant argues that Plaintiff's claims fail on multiple grounds. First, Defendant contends the bulk of Plaintiff's claims are barred by virtue of her failure to exhaust the relevant administrative remedies. (D.E. No. 70-1 ("Def. Br.") at 11–15). Second, Defendant argues that, even where Plaintiff's claims are not so barred, they are otherwise subject to dismissal as she has failed to plead a plausible entitlement to relief. (*Id.* at 15–34). Defendant asks that the Court dismiss Plaintiff's Complaint in its entirety.

Under Rule 12(b)(6), the Court may dismiss a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a Rule 12(b)(6) motion, the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). However, "threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The burden is on the moving party to show that the plaintiff has not stated a facially plausible cause of action. *See Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

In evaluating a plaintiff's claims, the Court considers the allegations in the complaint, as well as the documents attached to and specifically relied upon or incorporated therein. *See Sentinel Tr. Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("'[A] document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment.'") (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (internal quotation marks omitted).

### i. Plaintiff Has Failed to Exhaust Administrative Remedies as to the Bulk of Her Claims

"It is a basic tenet of administrative law that a plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief." *Slingland v. Donahoe*, 542 F. App'x 189, 191 (3d Cir. 2013) (quoting *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997)). This applies to Plaintiff's claims under both Title VII and the ADEA. *See, e.g.*, *Tummala*, 2024 WL 4449477, at *4 ("Before bringing a civil claim in court under Title VII, a [p]laintiff must exhaust all appropriate administrative remedies with the [EEOC]." (first citing *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001); and then citing 29 C.F.R. § 1614)); *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 111 (3d Cir. 2014) ("A plaintiff seeking relief under the ADEA must exhaust his or her administrative remedies as mandated by 29 U.S.C. § 626(d)."). A plaintiff's claims under either statutory scheme are subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) if he or she has failed to exhaust all applicable administrative remedies. *See Slingland*, 542 F. App'x at 191 ("Under our precedent, [the failure to exhaust administrative remedies] . . . is grounds for dismissal on a Rule 12(b)(6) motion.").

In the context of a Title VII claim, a plaintiff typically exhausts his or her administrative remedies by "filing a charge with the EEOC and receiving from the EEOC a notice of the right to

11

sue." *Devine v. St. Luke's Hosp.*, 406 F. App'x 654, 656 (3d Cir. 2011) (first citing 42 U.S.C. § 2000e–5(e)(1); and then citing *Burgh*, 251 F.3d at 470). "[A] plaintiff must comply with the procedural requirements set forth in 42 U.S.C. [§] 2000e–5, which include filing a charge with the EEOC or its state equivalent within 300 days of the alleged violation and receiving from the EEOC a notice of the right to sue." *Bey v. N.J. Dep't of L. & Pub. Safety*, No. 11-5589, 2012 WL 3647431, at *2 (D.N.J. Aug. 23, 2012) (citing 42 U.S.C. § 2000e–5(e)(1)). Thus, a plaintiff must obtain a "right-to-sue letter" from the EEOC before bringing suit under Title VII. *See Tummala*, 2024 WL 4449477, at *4 (citing *Burgh*, 251 F.3d at 470).

The ADEA's exhaustion requirements are similar. That statute prohibits a plaintiff from filing a civil action asserting ADEA claims "until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." 29 U.S.C. § 626(d)(1). Thus, while the ADEA does not require a plaintiff to wait for the EEOC to issue a right-to-sue letter, *Covington v. URS Corp.*, No. 11-04516, 2013 WL 2181282, at *2 (D.N.J. May 20, 2013) (citing *Seredinski v. Clifton Precision Prods. Co.*, 776 F.2d 56, 62–63 (3d Cir.1985)),[1] it does mandate that a plaintiff first bring any age discrimination claims to the EEOC before seeking judicial redress. That step "is a 'non-jurisdictional prerequisite'" to bringing an ADEA claim in court. *Shahin v. Delaware Dep't of Fin.*, 344 F. App'x 765, 766 (3d Cir. 2009) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007)).

Under both statutory schemes, even if a plaintiff successfully exhausts his or her administrative remedies as to a specific discrimination claim, any "ensuing suit [will be] limited to claims that are within the scope of the initial administrative charge." *Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010). "'The purpose of requiring exhaustion is to afford the

---

[1] "In the event that the EEOC issues a right-to-sue letter, an ADEA claimant must file its federal suit within ninety days after receipt of the letter." *Id.* (citing 29 U.S.C. § 626(e)).

12

EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court.'" *Id.* (quoting *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir.1996)). *Id.* Put another way, "the parameters of a discrimination action 'are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Money v. Provident Mut. Life Ins. Co.*, 189 F. App'x 114, 117 (3d Cir. 2006) (quoting *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–99 (3d Cir.1976), *cert. denied,* 429 U.S. 1041 (1977)). "[W]hen determining whether a claim fairly or reasonably falls within the investigation arising from a charge, courts consider (1) whether the claim arises from the same set of facts that support the original charge and (2) whether the claim advances the same theory of discrimination as the original charge." *Simko v. United States Steel Corp.*, 992 F.3d 198, 209 (3d Cir. 2021) (summarizing relevant precedent).

"Although this standard does not necessarily preclude a plaintiff from asserting a claim for the mere failure to check a box on an EEOC Charge Form, it does prevent a plaintiff from 'greatly expand[ing] an investigation simply by alleging new and different facts when [s]he [is] contacted by the Commission following [her] charge.'" *Barzanty*, 361 F. App'x at 414 (quoting *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 967 (3d Cir.1978)). Moreover, "[b]ecause the EEOC is required to serve notice on the employer against whom the charges are made, this standard also allows an employer to be put on notice of the claims likely to be filed against it." *Id.*

As described in Section I, above, Plaintiff filed a charge with the EEOC on or about May 12, 2020. (*See generally* Charge). In her Charge, Plaintiff checked boxes denoting both age and race-based discrimination but left the "retaliation" box unchecked. (*Id.*). Plaintiff also indicated that both the "earliest" and "latest" dates of discrimination were "1-27-2020", which is the date Defendant terminated her employment. (*Id.*). Indeed, the entire factual recitation in Plaintiff's

13

Charge concerns the December 2019 international trip to London, and the complaints, investigation, and discipline resulting therefrom. (*Id.*). The Court must, therefore, limit Plaintiff's claims in this action to those that "can reasonably be expected to grow out of" an investigation of her Charge. *Money,* 189 F. App'x at 117 (citation omitted).

Critically, Plaintiff's Charge included no mention of Defendants' allegedly discriminatory practices for staffing charter flights between 2015 and 2019. Nor could the Court reasonably expect an EEOC investigation regarding such practices to grow out of Plaintiff's statements regarding a single trip in December 2019 and its aftermath, as the two scenarios have no factual overlap. As Plaintiff has failed to exhaust her administrative remedies regarding the charter flight situation, the Court must dismiss the portion of Plaintiff's First Cause of Action premised on those allegations. Given that Plaintiff's Third Cause of Action alleges retaliation in connection with Plaintiff's complaints about the charter flight situation, that claim fails for the same reason.

Moreover, as New Jersey is considered a "deferral state", both Title VII and the ADEA required Plaintiff to file a charge with the EEOC within 300 days of any alleged discriminatory activity. *See, e.g.*, *Lavelle v. PSE&G Gas & Elec.*, No. 22-5735, 2023 WL 4947371, at *2 (D.N.J. Aug. 3, 2023) ("To pursue a Title VII or ADEA claim, a prospective plaintiff must file his Charge with the EEOC 'within one hundred eighty days after the alleged unlawful employment practice occurred' or, if applicable, 'within three hundred days' in 'deferral states,' such as New Jersey.") (citations omitted). That window closed, at the absolute latest, on April 23, 2021 (300 days after Defendant terminated Plaintiff's employment). As Plaintiff did not file a timely charge with the EEOC regarding her disparate treatment and retaliation claims under the ADEA, they are now time-barred, and the Court must dismiss them with prejudice.

14

The Court also finds, however, that Plaintiff *has* exhausted her administrative remedies with regard to her claims of age or race-based discrimination that allegedly took place in connection with the December 2019 trip and its aftermath.

### ii. Plaintiff Has Failed to State a Plausible Entitlement to Relief as to Her Remaining Claims

After dismissing the claims for which Plaintiff failed to exhaust her administrative remedies, three claims remain in the case: (1) Plaintiff's claim for wrongful termination based on age, in violation of the ADEA (First Cause of Action); (2) Plaintiff's claim for wrongful termination based on race, in violation of Title VII; (Second Cause of Action); and (3) Plaintiff's claim that Defendant subjected her to a hostile work environment based on racial discrimination in violation of Title VII (Second Cause of Action). (SAC ¶¶ 97–103). Defendant argues that Plaintiff has failed to articulate a plausible entitlement to relief on any of these claims, and this Court agrees.

The Court begins with Plaintiff's ADEA claim. In *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), the United States Supreme Court clarified that, to prevail on a wrongful termination claim under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id.* at 177–78. While the *Gross* Court questioned the utility of applying a burden-shifting framework to ADEA claims, *id.* at 178–89, the United States Court of Appeals for the Third Circuit has since found it appropriate to employ the *McDonnell Douglas* burden-shifting paradigm in age discrimination cases. *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). "Under the first step in *the McDonnell Douglas* analysis, the plaintiff bears the burden of making out a prima facie case of discrimination." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). The Court of Appeals has clarified:

15

> To establish a prima facie case of age discrimination under the ADEA, [a plaintiff] must make a showing that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.

*Id.*

Here, the Court finds that Plaintiff has not alleged any facts suggesting that Defendant replaced her with a younger employee, let alone that age was the "but-for" cause of Defendant's decision to terminate her employment. Nor can the Court reasonably infer such facts from Plaintiff's pleading, given her allegations regarding the December 2019 trip, her co-workers' complaints, and Defendant's subsequent actions. (*See, e.g.* SAC ¶¶ 75–76) (alleging that every other member of the flight crew for that trip colluded to provide Defendant with "false and exaggerated statements describing allegedly racially insensitive comments by Plaintiff."); (*id.* ¶¶ 84–85) (alleging that Defendant fired Plaintiff to avoid negative publicity). The Court must, therefore, dismiss the balance of Plaintiff's First Cause of Action.

Plaintiff's claim for wrongful, race-based termination fails for essentially the same reasons. Indeed, "[t]he familiar *McDonnell Douglas* burden shifting analysis applies to . . . claims of discrimination under both Title VII and the ADEA." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). To establish a claim for wrongful termination in violation of Title VII, a plaintiff must show: "(1) [he/she] belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." *Id.* Just as Plaintiff's factual allegations are insufficient to support an inference that Defendant terminated her

16

employment because of an age-based animus, they are likewise insufficient to support an inference of racial discrimination. Again, Plaintiff alleges that her coworkers on the December 2019 flight colluded to provide Defendant with corroborating accounts of "false and exaggerated statements" about Plaintiff's "racially insensitive comments." (SAC ¶¶ 75–76). Plaintiff alleges that Defendant ultimately terminated her "for alleged violation of Defendant's [anti-discrimination] policy." (*Id.* ¶ 88). While she makes a conclusory allegation that "Defendant's stated reason for discharging Plaintiff was a pretext, and Plaintiff was instead discharged because of her race or age", (*id.* ¶ 95), she does not allege any facts in support of that contention. Indeed, she elsewhere alleges that "Defendant's Management" directed her termination in fear of the negative publicity associated with Plaintiff's statement about her African-American co-worker. (*Id.* ¶¶ 84-85).

The Court now turns to Plaintiff's contention that Defendant subjected her to racial discrimination that amounted to a hostile work environment. Under Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits harassment that is "'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (citation omitted). To prove a prima facie claim for hostile work environment under Title VII, a plaintiff must show: (i) she suffered intentional discrimination because of her status in a protected class; (ii) the discrimination was severe or pervasive; (iii) the discrimination detrimentally affected her; (iv) the discrimination would detrimentally affect a reasonable person in like circumstances; and (v) the existence of *respondeat superior* liability. *Mandel v. M & Q Packaging Corp.*, 706

17

F.3d 157, 167 (3d Cir. 2013); *Dey v. Innodata Inc.*, No. 18-0978, 2022 WL 596977, at *5 (D.N.J. Feb. 24, 2022) (listing Title VII hostile work environment elements). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel*, 706 F.3d at 167. "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Plaintiff has not alleged sufficient factual content to establish a plausible entitlement to relief on her hostile work environment claim. All of Plaintiff's allegations of race-based discrimination concern Plaintiff's interactions with her coworkers during the December 2019 trip. On the initial flight, Plaintiff alleges that she "was ostracized and isolated by the other women in the flight crew." (SAC ¶ 53). Plaintiff does not allege facts suggesting that this had anything to do with her race, that such isolation happened on more than one occasion, or that her co-workers' behavior might be considered "severe." During the return flight, and in apparent response to Plaintiff referring to her African-American colleague as a "boy", Plaintiff's coworkers repeatedly chanted "Black Lives Matter", (SAC ¶ 68), and those coworkers "also repeatedly addressed Plaintiff as B***h and 'Karen', and directed the same words at her when Plaintiff was within hearing distance." (*Id.* ¶ 69). Those comments, limited to a single flight, were not pervasive. Nor, considering the totality of the circumstances (e.g., Plaintiff's coworkers made the comments in response to her own statement about a fellow coworker), does the Court find that they were sufficiently severe to support a plausible hostile work environment claim. Finally, Plaintiff has not alleged facts suggesting that her coworkers' behavior detrimentally affected her, or that they

would have had a detrimental impact on a reasonable person under the same circumstances. The Court must, therefore, dismiss Plaintiff's hostile work environment claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

### III. CONCLUSION

Based on the foregoing, Defendant's motion to dismiss Plaintiff's Second Amended Complaint is **GRANTED IN-PART AND DENIED IN-PART**. Defendant's motion is **DENIED** to the extent it is based on Plaintiff's failure to effectuate timely service. Defendant's motion is otherwise **GRANTED**. To the extent Plaintiff's ADEA claims (both disparate treatment and retaliation), are based on Defendant's alleged staffing of chartered flights, those claims are **DISMISSED** *with prejudice*. The balance of Plaintiff's claims are **DISMISSED** *without prejudice*. Within 30 days, Plaintiff may file an amended complaint curing the shortcomings in those claims, as detailed herein.

An appropriate Order accompanies this Opinion.

Dated: September 30, 2025

s/ Esther Salas
**Esther Salas, U.S.D.J.**